UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| PATRICK MARLOWE | ) | |
| | ) | |
| v. | ) | No. 3:09-0932 |
| | ) | JUDGE CAMPBELL |
| UNITED STATES OF AMERICA | ) | |

MEMORANDUM

I. Introduction

Pending before the Court is a Motion To Vacate, Set Aside, Or Correct Conviction And Sentence Under 28 U.S.C. § 2255 (Docket No. 1), filed by the Movant/Petitioner (hereinafter "Petitioner"). The Government has filed a Response to the Motion. (Docket No. 6), and the Petitioner has filed a Reply (Docket No. 7).

The Court has reviewed the pleadings and briefs filed by both parties, the record of Petitioner's underlying conviction, and the entire record in this case. For the reasons set forth below, the Court concludes that Petitioner's Motion To Vacate is DENIED, and this action is DISMISSED.

II. Procedural and Factual Background

In the underlying criminal case, the Petitioner was charged in an Indictment with conspiracy to violate civil rights, in violation of 18 U.S.C. § 241 (Count One); and seven counts of deprivation of civil rights, in violation of 18 U.S.C. § 242 (Counts Two, Three, Four, Five, Six, Seven, and Eight). (Docket No. 1 in Case No. 3:04-00129). Each of the substantive counts alleged an assault by one or more Defendant jail guards on a named inmate, with Count Two alleging the assault of inmate Walter Kuntz resulted in his death, and Count Three alleging that

the failure to provide necessary medical care resulted in the death of inmate Kuntz. (Id.) Under the applicable statute, a conviction involving bodily injury is subject to imprisonment of up to 10 years, and a conviction involving death is subject to imprisonment for life. 18 U.S.C. § 242. Four other defendants – Gary Hale, Tommy Shane Conatser, Robert Brian Ferrell, and Robert Locke -- were also named in the Indictment. (Id.) Two of the co-defendants, Hale and Ferrell, pled guilty to Counts One and Seven, respectively, prior to trial. (Docket Nos. 139, 140, 142, 143 in Case No. 3:04-00129).

At the conclusion of a twelve-day trial, the Petitioner was convicted of the charges in Counts One, Two, Three, Four, Five, Six, and Seven. (Docket No. 185 in Case No. 3:04-00129). The jury found that the assault alleged in Count Two did not result in the death of inmate Kuntz, but also found that inmate Kuntz's death was the result of the failure to provide necessary medical care as alleged in Count Three. (Id.) Petitioner was acquitted of the charge in Count Eight. (Id.) Co-defendant Conatser was convicted of the charge in Count One, and acquitted of the charges in Counts Four and Six. (Docket No. 187 in Case No. 3:04-00129). Co-defendant Locke was acquitted of Counts One and Seven (Docket No. 189 in Case No. 3:04-00129).

At the subsequent sentencing hearing, the Court sentenced the Petitioner to a life term on Count Three, concurrent with ten years on all other counts. (Docket Nos. 282, 283 in Case No. 3:04-00129).

The Petitioner appealed his sentence, and the Sixth Circuit affirmed. (Docket No. 294 in Case No. 3:04-00129); United States v. Tommy Shane Conatser and Patrick Marlowe, 514 F.3d 508 (6th Cir. 2008)). The Petitioner then filed a petition for writ of certiorari with the United States Supreme Court, which was subsequently denied. (Docket No. 296 in Case No. 3:04-

2

00129); Patrick Marlowe v. United States, 129 S.Ct. 450 (2008)).

In its decision, the Sixth Circuit presented the relevant facts as follows:

   The investigation into the death of detainee Walter Kuntz from injuries inflicted while in custody on January 13, 2003, led to an 8-count indictment in this case. The conspiracy count alleged that between July 2001 and January 2003, Marlowe, Conatser, and codefendants Gary Hale, Robert Ferrell, and Robert Locke conspired to 'injure, oppress, threaten and intimidate detainees and prisoners at the Wilson County Jail in the free exercise and enjoyment of the rights and privileges secured to them by the Constitution and laws of the United States, namely the rights not to be deprived of liberty without due process of law and to be free from cruel and unusual punishment while in official custody and detention.' 18 U.S.C. § 241. It was alleged that, as the means, manner, and object of the conspiracy, the coconspirators would punish, harm, and intimidate by striking, punching, kicking, and assaulting detainees and prisoners; discuss and brag about the assaults, including keeping a tally of those individuals rendered unconscious by Marlowe; and conceal such assaults by withholding medical care and falsifying incident reports.

   Nineteen overt acts were alleged in furtherance of the conspiracy-seven of which were also charged as substantive offenses. The substantive counts asserted that the various defendants, aided and abetted by each other, assaulted certain prisoners and detainees (collectively referred to as inmates) in violation of their civil rights. 18 U.S.C. §§ 242 and 2. The statute provides for enhanced penalties of (1) imprisonment for not more than 10 years 'if bodily injury results from the acts committed in violation of this section,' and (2) any term of years or for life 'if death results from the acts committed in violation of this section.' 18 U.S.C. § 242. Both Hale and Ferrell pleaded guilty to a single count under a plea agreement and testified at trial. Locke was tried jointly with Marlowe and Conatser, but was acquitted of both conspiracy and the one substantive charge against him. Marlowe and Conatser were convicted of the conspiracy.

   Central to Marlowe's appeal are his convictions on counts 2 and 3, which alleged that Marlowe and Hale, aided and abetted by each other, assaulted Kuntz (count 2) and failed to provide him with necessary and appropriate medical care (count 3) in violation of his civil rights and that their conduct resulted in bodily injury or death. The jury specifically found in convicting Marlowe that the acts at issue in the assaults that violated Kuntz's rights resulted in bodily injury (but not death), but that the acts at issue in the denial of medical care that violated Kuntz's rights resulted in Kuntz's death. As a result, the statutory penalty for Marlowe's conviction on count 3 was any term of years or life imprisonment.

   Counts 4 through 8 alleged assaults on inmates that resulted in bodily injury.

3

Specifically, the indictment charged that Marlowe, Conatser, and another officer assaulted Paul Armes on April 30, 2002 (count 4); that Marlowe and others assaulted Sergio Martinez on October 6, 2001 (count 5); that Marlowe and Conatser assaulted Kenneth McIntyre in July 2001 (count 6); that Marlowe, Hale, Ferrell, and Locke assaulted Dartanian McGee on July 20, 2002 (count 7); and that Marlowe and Ferrell assaulted Larry Clark on September 10, 2002 (count 8). Conatser was acquitted of counts 4 and 6. The jury found Marlowe guilty of counts 4 through 7, but acquitted him on count 8.FN1

> FN1. Several other officers pleaded guilty under separate indictments to offenses connected to the conspiracy, including: Travis Bradley for lying about the assault on Armes; William Westmoreland for his participation in the assault on McIntyre; John McKinney for filing a false report about the assault on Clark; and Christopher McCathern for participating in another assault alleged as an overt act.

The district court sentenced Conatser to a term of 70 months' imprisonment for the conspiracy conviction. Marlowe was sentenced to life imprisonment on count 3 for the denial of medical care that resulted in Kuntz's death, to run concurrently with the ten-year sentences imposed on each of counts 2, 4, 5, 6, and 7. Conatser and Marlowe appealed.

\* \* \*

There was considerable evidence that a group of second-shift officers, led by Marlowe, would strike and kick inmates who were loud, obnoxious, or uncooperative and would conceal their unjustified use of force through the denial of medical care and the falsification of incident reports. Marlowe, a young sergeant, was the supervisor of the second shift, from 4:00 p.m. to midnight, during the relevant period. The jail, constructed to house 106 inmates, was chronically overcrowded. For example, on the day that Kuntz was beaten, there were 190 inmates in the jail. The second shift was usually staffed by four to seven corrections officers, none of whom were higher-ranking officers. As the investigation progressed, a number of second-shift officers admitted their own part in these assaults and that they accompanied Marlowe during assaults or stood outside a cell while Marlowe or others committed assaults.

Marlowe led by example and set the tone for other officers. Christopher Finley testified that Marlowe told him that 'second shift was a different kind of shift'; that 'no reports were done'; and that there was 'no talking to higher up individuals unless everything went through him.' Travis Bradley testified that on his first night working the second shift, Marlowe beat a 'mouthy' drunk and then told Bradley 'welcome' to second shift. Bradley also explained how Marlowe

would get an uncooperative inmate 'gassed up' and ready to fight by making smart remarks, belittling him, or cussing at him.

Marlowe had a penchant for striking inmates hard enough to render them unconscious, and he and other officers kept an oral tally of those assaults that was referred to as the 'knock-out list.' That 'list' ultimately had as many as 21 people on it. In fact, Gary Hale testified that Marlowe instructed him to land his blows in the temple area because it was a 'knock-out point.' Marlowe and other officers would discuss, recount, and reenact these assaults when they were together. They would not do so, however, if any of the few officers who were not part of the 'inner circle' were around. Without recounting all of the details or touching on all of the assaults or acts alleged as overt acts and substantive civil rights violations, we briefly discuss four specific incidents that reflect the nature of the conduct involved and are pertinent to the issues raised on appeal.

1. McIntyre

In the summer of 2001, Kenneth McIntyre was in the booking area using the telephone when he became agitated. He spit at one officer, William Westmoreland, but hit Marlowe instead. Marlowe, Conatser, and another officer named John McKinney immediately removed McIntyre to a holding cell. Westmoreland followed them and observed several officers striking McIntyre in the body. Westmoreland then joined in the assault by hitting McIntyre in the head. Although McIntyre's face was swollen and cut, no incident report was written. Conatser was acquitted of the charge associated with this assault; but Marlowe was convicted.

2. Martinez

Arrested for drunk driving in October 2001, Sergio Martinez was 'mouthy' but not physically aggressive or threatening. When Martinez refused to answer questions during booking, Marlowe yelled at him and called him a 'sawed-off little bastard.' Martinez reciprocated with statements about 9-11, including that he was glad it happened and that he wished he had been one of the pilots so they could have killed more Americans. During the process, Martinez kicked off his boots and one of them hit Conatser. At some point during booking, Marlowe got out a pair of black gloves. Westmoreland took this as a signal that Martinez 'was probably going to get beat.' Marlowe and Westmoreland escorted Martinez to a detox cell, and Conatser followed but did not go in. While Conatser testified that he returned to the booking area, Westmoreland said Conatser was still outside the cell when they came out.

Once inside the cell, Marlowe punched Martinez in the jaw with his left hand so hard that it rendered Martinez unconscious for five to seven seconds. They

5

waited until Martinez 'came to,' and then Westmoreland struck him five or more times and Marlowe hit him so many times that Westmoreland said he 'couldn't even keep count.' Marlowe also kicked Martinez once or twice after he collapsed on the floor. Walking back to booking, Marlowe said he was surprised to have knocked Martinez out with a blow from his left hand. Later that night, Marlowe, Conatser, Westmoreland, and other officers from the second shift talked about the incident in the parking lot and the fact that Martinez was 'number 11' on Marlowe's 'knock-out list.'

Two reports were written by Marlowe and one by Conatser, but Westmoreland was instructed not to write one. Marlowe's reports falsely stated that Martinez was physically aggressive inside the cell, that Conatser threatened Martinez with a chemical agent if he refused to stop hitting the door, and that Martinez was provided basic medical care. Conatser's report did not mention any use of force against Martinez, but stated that Martinez had head-butted the door and was threatened with use of a chemical agent. Medical evidence established that Martinez's right jaw was broken, and that it would not have resulted from a fall or running into a door or wall.

3. Armes

On April 30, 2002, Marlowe was forced off the road by a suspected drunk driver named Paul Armes. Marlowe, who was off-duty at the time, followed Armes, called the authorities, and waited until Armes was under arrest before going on his way. The arresting officer described Armes as uncooperative but not threatening or physically aggressive, and testified that a breathalyzer test showed Armes to have a blood alcohol level of .17.

After booking him, Conatser and Bradley took Armes to the detox cell. According to Bradley, Armes was unsteady on his feet and staggered toward them. While Bradley did not feel threatened by Armes, Conatser testified that he did and reacted by striking Armes once in the face. Bradley then restrained Armes, who did not resist. As Conatser and Bradley left the cell, Conatser realized that he had seriously injured a knuckle. According to Conatser, Armes began banging on the cell door and he went in with another officer named Christopher McCathern. Armes charged McCathern, who forced Armes to the ground and held him there until he calmed down.

Later, Marlowe came to the jail, spoke with Conatser, and went into the cell where Armes was being held. Bradley testified that Marlowe, who appeared 'fairly angry,' went into Armes's cell from which Bradley could hear yelling and the sound of blows, grunts, and groans. Bradley testified that one could hear the distinctive sounds of blows being struck from the booking desk, which was located approximately 20 feet away from the cell. Marlowe went outside to 'cool

6

off,' then went back into the cell and resumed yelling and hitting Armes. Bradley then went into the cell and sprayed Armes with a chemical agent. At some point after Marlowe arrived at the jail, Conatser went to get medical attention for his knuckle.

Marlowe, Conatser, and Bradley wrote reports about the incident. Conatser stated that he avoided an initial punch from Armes and then hit Armes after he continued to 'fight and resist.' Bradley testified that although his report described Armes as having lunged at him and Conatser, it was more accurate to say that Armes had staggered toward them. Marlowe's report did not mention any use of force. Westmoreland and Hale, neither of whom had been at the jail that night, testified that Marlowe told them about the incident. Specifically, Marlowe told Hale that he called the jail before arriving and told the officers to 'handle it' until he got there, and that after the second or third blow he had felt Armes's face 'crush' and it 'felt like mush.' Westmoreland testified that Marlowe said he had 'beat the shit' out of Armes for running him off the road. Armes did not receive medical attention at the jail. Evidence at trial showed that Armes's cheekbone was broken in three places, two metal plates were surgically implanted to treat the fractures, and a facial nerve was damaged.

4. Kuntz

On January 13, 2003, Walter Kuntz was involved in a minor automobile accident and was apprehended at a convenience store after leaving the scene. Kuntz struggled briefly with officers during the arrest and complained about an injury to his lip. When Kuntz was brought to the jail at 3:30 p.m., the only injuries noted were a discoloration of his lips and an abrasion to his forehead. It was later estimated that Kuntz's blood alcohol level at the time of his arrest was .26.

Booked without incident, Kuntz was placed in the detox cell. A short while later, Kuntz began screaming and banging on the cell door. Marlowe told him to be quiet, but Kuntz would not. When Marlowe and Finley entered the cell, Kuntz threw a roll of toilet paper at Marlowe. Marlowe punched Kuntz in the left side of his head, threw him toward the wall, and kicked, punched, and kneed Kuntz in the rib area. Kuntz was screaming when they left the cell, but quieted down for about 30 minutes before continuing to bang on the cell door. Finley testified that Marlowe got more agitated, then went back into the cell with Finley and another officer named Donald Willis. Willis testified that Kuntz was standing up, but was not aggressive. Marlowe struck Kuntz in the left temple area, knocking him down, and then punched and kicked Kuntz some more. Willis sprayed Kuntz with a chemical agent as they left the cell.

Kuntz was quiet for a time, but then started to yell and kick the cell door again. Hale testified that at approximately 5:00 p.m., Marlowe told him that he had

7

already hit Kuntz in the head and instructed Hale to 'take care of the situation.' Hale understood Marlowe to mean that he should do whatever it took to make Kuntz stop beating the door. This time, Hale, Finley, and Willis went into the detox cell. Kuntz backed away, and Hale pushed him onto the bench next to the wall. The right side of Kuntz's head was facing Hale and the left side was four or five inches from the wall. Hale admitted that he delivered three or four 'full power' punches to the right side of Kuntz's head. Each time, the left side of Kuntz's head bounced off the wall and made a 'cracking sound.' The officers left Kuntz holding his head and moaning. Hale told Marlowe that he had 'taken care of it.'

Willis took a call from Kuntz's mother, who advised him that Kuntz had undergone brain surgery a year or two earlier. Willis told Hale and Marlowe about the call. Hale looked worried, but nothing was done. When Hale returned to the cell at 6:00 p.m. to advise Kuntz of the charges, Kuntz was conscious but did not respond to Hale. Between 7:00 and 7:30 p.m., Hale returned and found Kuntz lying on the bench, 'passed out' in his own vomit. Marlowe and Hale had an inmate clean Kuntz up and turn him so he would not choke if he vomited again. Kuntz was not responsive, but no medical attention was ordered. Marlowe testified that he thought Kuntz was extremely drunk and might have taken some pills.

Between 8:45 and 9:00 p.m., Hale went into the cell and found that Kuntz had vomited again. Hale and Marlowe cleaned him up and tried to rouse him by shaking him, patting him, and pouring a bucket of ice water over him. Kuntz did not move or show any signs of consciousness. Hale and Marlowe used ammonia smelling salts, which did not rouse him. They noticed that Kuntz would stop breathing until the salts were taken away. No steps were taken to get medical care at that time.

In the next hour, Willis checked on Kuntz and found him lying down with his eyes open. Kuntz did not respond to being shaken or having a light shone in his eyes. Willis alerted Marlowe, but nothing was done. At 10:00 p.m., Hale suggested that they call his father, who was a judicial commissioner FN2 and had some EMT experience. Marlowe agreed. Hale's father arrived at approximately 11:00 p.m., and recommended that they call an ambulance. At that time, Hale told Finley not to worry about writing a report because he and Marlowe would take care of it.

> FN2. Judicial commissioners sign warrants, set bail, and perform other administrative tasks.

When the ambulance arrived a little after 11:30 p.m., the EMTs evaluated Kuntz and determined that he was a level three on the level of consciousness

8

scale-the same level as a deceased person. The EMTs had been dispatched for a case of possible alcohol poisoning, and neither Marlowe nor Hale told the EMTs or Hale's father that Kuntz had received repeated blows to the head. There was evidence that if the EMTs had known that Kuntz might have a head injury, he would have been airlifted directly to a trauma center. Instead, Kuntz went to a local medical center. Upon examination, doctors noted that Kuntz was wet and his body temperature was ten degrees below normal. After a brain scan, Kuntz was then flown to a trauma center.

> A neurosurgeon evaluated Kuntz, who was on a ventilator and had no brain stem reflexes. The doctor concluded that Kuntz had a very large subdural hematoma that had caused irreversible brain damage. He added that Kuntz's low body temperature had exacerbated his condition because it interfered with normal clotting. Kuntz died when he was removed from the ventilator two days later.FN3
>
>> FN3. Autopsy revealed that Kuntz also had three broken ribs, contusions and abrasions to his abdomen and back, and a bruised scrotum.
>
> Several doctors testified at trial that Kuntz's head injuries were consistent with blunt force trauma, and that such injuries are generally treatable if medical attention is sought in the first hours after a brain injury. It was also explained that within an hour of injury a person with a subdural hematoma would start to experience a progression of symptoms such as dizziness, headache, nausea, vomiting, sleepiness, lethargy, and eventually unresponsiveness.

United States v. Conatser, Marlowe, 514 F.3d at 512 -518.

### III. Analysis

A. The Petitioner's Claims

Petitioner contends that his conviction should be vacated because he received the ineffective assistance of counsel.

B. The Section 2255 Remedy/Evidentiary Hearing Not Required.

Section 2255 provides federal prisoners with a statutory mechanism by which to seek to

9

have their sentence vacated, set aside or corrected.[1] The statute does not provide a remedy, however, for every error that may have been made in the proceedings leading to conviction. The statute contemplates constitutional errors, and violations of federal law when the error qualifies as a "fundamental defect which inherently results in a complete miscarriage of justice." Reed v. Faley, 512 U.S. 339, 114 S.Ct. 2291, 2296, 2299-2300, 129 L.Ed.2d 277 (1994); Grant v. United States, 72 F.3d 503, 505-06 (6th Cir. 1996).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that the Court shall consider the "files, records, transcripts, and correspondence relating to the judgment under attack" in ruling on a petition or motion filed under Section 2255. In addition, where the same judge considering the Section 2255 motion also conducted the trial, he may rely on his recollections of the trial. Blanton v. United States, 94 F.3d 227, 235 (6th Cir. 1996).

An evidentiary hearing is not required if the record conclusively shows that the Petitioner is not entitled to relief. 28 U.S.C. § 2255; Rule 8 of the Rules Governing Section 2255 Proceedings For The United States District Courts; Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999). No hearing is required "if the petitioner's allegations 'cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" Id. (quoting Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995)). In

---

[1] 28 U.S.C. § 2255 states, in part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

10

addition, no hearing is required if the petitioner's allegations, accepted as true, would not entitle the petitioner to relief. Engelen, supra.

The Court has reviewed all the files, records, transcripts and correspondence filed in the proceeding underlying Petitioner's conviction, as well as the pleadings, briefs, and records filed by the parties in this case. The Court finds it unnecessary to hold an evidentiary hearing because the record conclusively establishes that Petitioner's allegations which are not contradicted by the record indicate that he is not entitled to relief on the issue raised.

C. Ineffective Assistance of Counsel

In order to prevail on an ineffective assistance of counsel claim, the burden is on the Petitioner to show: (1) trial counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for the deficiency, the outcome of the proceedings would have been different. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); Campbell v. United States, 364 F.3d 727, 730 (6th Cir. 2004).

The objective standard of reasonableness "is a highly deferential one and includes a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Campbell, 364 F.3d at 730 (quoting Mason v. Mitchell, 320 F.3d 604, 616-17 (6th Cir. 2003)). A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland, 466 S.Ct. at 694; Ivory v. Jackson, 509 F.3d 284, 294 (6th Cir. 2007).

As the Supreme Court has explained, a court need not determine whether counsel's performance was deficient before examining whether prejudice resulted from the alleged deficiencies. Strickland, 466 S.Ct. at 697; Ivory, 509 F.3d at 294. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be

11

so, that course should be followed." Id.

For purposes of the pending Motion, the Court will assume the truth of the allegations set forth in the Motion, which the Petitioner has signed under penalty of perjury, except where those allegations are clearly contradicted by the record. The Motion states that shortly after his arrest, Petitioner was appointed counsel, and Roger N. "Bo" Taylor was assigned to represent him. (Motion, at 4-5). The Motion describes the circumstances of that representation as follows:

> From the outset of the case, Defendant Patrick Marlowe communicated openly and honestly with Mr. Taylor about the true nature of his conduct. He candidly admitted assaulting some of the inmates and falsifying reports relating to inmate injuries. However, he emphatically denied causing the death of inmate, Walter Kuntz. He advised Taylor that he did not cause or orchestrate the fatal assault on Kuntz. Further, he advised Taylor that, although he did not obtain prompt attention for Kuntz, the Wilson County Jail did not provide training that would have enabled him to recognize the need to do so, and he mistook the signs of head trauma for the signs of intoxication. Marlowe's trial testimony was consistent with his statements to Taylor about his own conduct.
> 
> Marlowe and Taylor discussed the Indictment and Marlowe's explanations of fact as to each count. Marlowe candidly acknowledged that he would be convicted of the assaults, and Taylor estimated Marlowe's guideline exposure on those counts to be in the 70 to 87 months range. Marlowe and Taylor accepted that Marlowe's conviction on the inmate assaults (Counts 1, 4, 5, 6, 7 & possibly 8) was inevitable.
> 
> Therefore, the entire defense was geared toward defending against the second degree murder allegation. To establish the defense to Counts 2 and 3, Taylor retained the services of expert witnesses and developed compelling evidence to illustrate that Gary Hale (not Marlowe) was responsible for beating Kuntz to death and that the signs of intoxication were extremely similar to the signs of a closed head injury – particularly to someone without medical training. Throughout the preparation of the case for trial, Taylor conferred with Marlowe about the nature of the defense proof he was developing, and Taylor expressed confidence in his defense to Counts 2 and 3.
> 
> Taylor advised Marlowe that, if convicted of maliciously murdering or causing the death of Kuntz, he could face a life sentence. However, Taylor calculated Marlowe's trial exposure very differently if the jury were to find that he did not commit the second degree murder of Kuntz. Taylor explained and Marlowe believed that, assuming the jury rejected Marlowe's responsibility for the murder

12

in Count 2, his trial exposure (guideline calculation) could be lower than his guideline calculation for the assaults. Marlowe believed that he would be facing a total of 10 to 12 years for failing to render aide to Kuntz coupled with the inevitable assault convictions – so long as the jury agreed that he did not commit the second degree murder of Kuntz.

Together, Marlowe and Taylor reviewed the discovery which revealed the substantial and damning proof to be offered in the government's case-in-chief. The focus of the defense was defeating the second degree murder styled charge in Count 2 and showing lack of intent in Count 3. Marlowe clearly understood that, if convicted of assaulting Kuntz with the intent to kill him as charged in Count 2, he would be facing a life sentence. However, Taylor explained and Marlowe also understood that he would not be facing a realistic trial exposure to a life sentence unless the jury credited that his own premeditated, intentional, malicious conduct resulted in Kuntz's death. Furthermore, Marlowe did not know or understand that he could be facing life sentences for the conduct charged in the remaining counts. He believed that the guideline calculations were an accurate forecast of his trial exposure. Taylor did not advise Marlowe that his trial exposure on all counts was life even if the jury found that he did not directly cause Kuntz's death.

Shortly before trial, the landscape of the case changed. Co-defendant Gary Hale entered into a cooperation based plea agreement with the government and was poised to testify against Marlowe at trial. Taylor advised Marlowe that this proof would be very damaging and could even result in a conviction for the second degree murder of Kuntz, which could result in a life sentence to Marlowe. Around the same time, the government extended a plea offer to Marlowe through Taylor. Marlowe was offered a 15 year sentence in exchange for a guilty plea. Marlowe and Taylor met to discuss the proposed settlement.

During the meeting, Taylor explained the devastating impact that Hale's testimony could have on their defense. Marlowe was distraught and emotional during the meeting. Marlowe believed that his trial exposure (if the planned defense corroborating Marlowe's version of events was successful) was in the 12 year range. The government's offer was 15 years, but Marlowe was concerned that Hale might attempt to pin the murder of Kuntz on him rather than taking personal responsibility – resulting in a potential life sentence. During the meeting with Taylor, Marlowe was leaning toward accepting the offer but, upon the suggestion of Taylor, Marlowe went home to discuss it with his family and sleep on it overnight.

During the plea discussion meeting, Taylor did not review the statutory or guideline penalties with Marlowe. He did not chart, write out or discuss Marlowe's potential trial exposure under various contingencies of potential conviction. Likewise, Taylor did not make a recommendation as to whether Marlowe should accept the offer. Consequently, Marlowe left the meeting with a

13

misunderstanding of his trial exposure versus the plea offer.

Marlowe then went home and had a flawed discussion with his family about the plea offer and what he believed his trial exposure to be, both if the defense regarding the murder charge was successful (10-12 years) and if it failed (life). Taylor did not participate in that family meeting.

However, at some point that evening, Taylor called Marlowe and spoke with him offering words of consolation and encouragement like – 'we've still got this.' Marlowe believed that Taylor was expressing confidence in the defense and he mistook those words for advise that he should reject the offer.

On the following morning, Marlowe communicated to Taylor that he could not plead guilty to something he did not do (meaning the murder of Kuntz) and that he would have to trust the defense. Taylor took a low pressure approach to the discussion and did not attempt to review Marlowe's trial exposure with him to assure that he was making a knowing and intelligent decision. Taylor did not counsel Marlowe that he was making a mistake by rejecting the offer. Moreover, Taylor did not advise Marlowe that at trial he would be facing a life sentence (much less 7 life sentences) even if the defense was successful or partially successful. Rather, the plea discussion was put to rest and trial preparation resumed.

Ultimately, even though the defense was partially successful, and as to Count 2, the jury rejected the government's theory that Marlowe caused Kuntz's death, Marlowe was sentenced to 7 concurrent, life sentences. At no point in any pretrial discussion did Taylor ever explain that such a sentence was a possibility. Had Marlowe been properly advised as to his potential penalties and trial exposure, a plea agreement would have been reached.

As a result of Taylor's failure to correctly calculate and properly advise Marlowe of his trial exposure under various contingencies, Marlowe misunderstood his trial exposure and made an uninformed decision to reject a 15 year plea offer that he should have accepted. But for Taylor's constitutionally deficient performance, Marlowe would have accepted the government's plea offer.

(Motion, at 5-9). Petitioner also alleges that ". . . had Taylor expressly recommended that Marlowe accept the government's plea offer, Marlowe would have followed that advice." (Motion, at 9).

The Supreme Court has held that defendants have a constitutional right to effective

14

assistance of counsel during plea negotiations. Hill v. Lockhart, 474 U.S. 52, 58-59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). "A defendant challenging his attorney's conduct during plea bargaining 'must show that counsel did not attempt to learn the facts of the case and failed to make a good-faith estimate of a likely sentence.'" Short v. United States, 471 F.3d 686, 692 (6th Cir. 2006)(quoting United States v. Cieslowski, 410 F.3d 353, 358-59 (7th Cir. 2005)). He must also show "'that his lawyer's deficiency was a decisive factor in his decision to plead guilty.'" Id.

Failure to convey the terms of a plea offer has been held to constitute ineffective assistance of counsel. Smith v. United States, 348 F.3d 545, 552-53 (6th Cir. 2003). In addition to conveying the plea offer, counsel is expected to "review the charges with [the defendant] by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available." Id., at 553.

The Sixth Circuit has held, however, that the decision to plead guilty "first, last, and always – rests with the defendant, not his lawyer." Smith v. United States, 348 F.3d at 552. "Although the attorney may provide an opinion on the strength of the government's case, the likelihood of a successful defense, and the wisdom of a chosen course of action, the ultimate decision of whether to go to trial must be made by the person who will bear the ultimate consequence of a conviction." Id. See also Purdy v. United States, 208 F.3d 41, 45 (2nd Cir. 2000)(Counsel must not coerce a client into either accepting or rejecting a plea offer.)

In considering Petitioner's allegations regarding his representation, the Court concludes at the outset, that they are clearly contradicted by the record in two respects. First, the allegation that Petitioner was subject to, and was sentenced to, seven life sentences finds no support in the

15

record. As explained above, Petitioner was subject to a life sentence on Counts Two and Three if his conduct resulted in the death of inmate Kuntz. 18 U.S.C. § 242 (". . . if death results from the acts committed in violation of this section . . . shall be fined under this title, or imprisoned for any terms of years or for life, or both. . .") The other counts, however, alleged only bodily injury, and therefore, carried a maximum sentence of 10 years. Id. (". . . if bodily injury results from acts committed in violation of this section . . . shall be fined under this title or imprisoned not more than ten years, or both. . ."). Petitioner was convicted of Counts One through Seven, with the jury finding that the conduct in Count Three caused the death of inmate Kuntz, and that the conduct in the other counts caused bodily injury. (Verdict Form for Defendant Marlowe (Docket No. 185 in Case No. 3:04-00129)). The Presentence Investigation Report clearly reflects the maximum penalties set forth in the statute, as stated above, on the counts for which Petitioner was convicted. (Docket No. 285, at ¶ 108 in Case No. 3:04-00129 ("Count One: Not more than 10 years. 18 U.S.C. § 241. Counts Two, Four, Five, Six, and Seven: Not more than 10 years on each count. 18 U.S.C. § 242. Count Three: Life imprisonment. 18 U.S.C. § 242."). The Judgment, as well as the transcript of the sentencing hearing, clearly indicate that the Court imposed a life sentence only on Count Three, and concurrent ten-year sentences on the other counts for which Petitioner was convicted. (Judgment, at 2 (Docket No. 282 in Case No. 3:04-00129); Transcript of Sentencing Hearing, at 124-25 (Docket No. 291 in Case No. 3:04-00129)). Thus, Petitioner's allegation that counsel erred in failing to advise him that he faced seven life sentences, and that he was actually sentenced to seven life terms, is clearly without merit.

Petitioner also appears to allege that he did not understand that he was subject to a life sentence on Count Three if the jury found that inmate Kuntz died as a result of the failure to provide necessary medical care and treatment. Although it is not entirely clear from the

16

allegations that Petitioner is referring to Count Three, he states that he "believed that he would be facing a total of 10 to 12 years for failing to render aide to Kuntz coupled with the inevitable assault convictions – so long as the jury agreed that he did not commit the second degree murder of Kuntz." (Motion, at 6). This allegation is also belied by the record.

During his initial appearance before the Magistrate Judge, Petitioner agreed that he had received a copy of the Indictment, which alleged that the death of inmate Kuntz was caused by the conduct alleged in Counts Two and Three. (Transcript of Initial Appearance, at 3-4 (Docket No. 298 in Case No. 3:04-00129). The Magistrate Judge then specifically advised the Petitioner of the penalties he faced for the charges in the Indictment:

> You are charged with one count of civil rights conspiracy, while acting under color of law, combining, conspiring and agreeing with other persons to injure, oppress, threaten and intimate (sic) detainees and prisoners at the Wilson County Jail in the free exercise and enjoyment of the rights and privileges secured to them by the Constitution and laws of the United States in violation of 18 U.S.C. section 241. If you're convicted of that charge Sir, you face a maximum term of 10 years in prison, and a maximum fine of $250,000.
>
> You are also charged with *two counts* of deprivation of civil rights, with regard to the *death of an inmate, or rather a detainee, Walter Kuntz* at the Wilson County Jail, in violation of 18 United States Code, section 242. If you are ultimately convicted of that charge Sir, *you face a maximum term of life in prison on each count of which you are convicted* and a maximum fine of $250,000.
>
> Finally, you are charged with five counts of deprivation of civil rights with regard to bodily injuries inflicted upon several inmates and/or detainees, Mr. Paul Arms, Mr. Sergio Martinez, Mr. Kenneth McIntyre, Mr. Dartanyan McGee and Mr. Larry Clark, all in violation of 18 United States Code, section 242. If you are ultimately convicted of any of those charges, you face a maximum term of 10 years in prison on each charge which you are convicted, and a maximum fine of $250,000.

(Transcript of Initial Appearance, at 3-4 (Docket No. 298 in Case No. 3:04-00129)). At no time during the trial, nor during his allocution at the sentencing hearing, did the Petitioner express surprise that he faced a life sentence for the death of inmate Kuntz as alleged in Count Three.

17

(Transcript of Sentencing Hearing, at 74-79 (Docket No. 291 at Case No. 3:04-00129)). Thus, the Court is not persuaded that counsel was ineffective for any failure to make clear to the Petitioner that he face a life sentence on Count Three as the record indicates that Petitioner was advised of the potential sentence.

As for the other allegations in the Motion, the Court concludes that Petitioner has failed to establish that trial counsel's representation was inadequate. First, Petitioner admits that he and counsel discussed the Indictment and the facts relating to each count. Petitioner admits that he knew he faced at least one life sentence if convicted at trial. Petitioner admits that counsel retained experts to assist with his defense to Count Two – that Hale caused inmate Kuntz's death – and Count Three – that without medical training, Petitioner reasonably assumed inmate Kuntz was simply intoxicated. Petitioner also admits that counsel reviewed the "substantial and damning proof to be offered in the government's case-in-chief" and that counsel advised him that the trial testimony of Co-defendant Hale would likely have a "devastating impact" on his defense. (Motion, at 7). Petitioner admits that he knew that Hale might attempt to "pin the murder of Kuntz on him," which would result in a potential life sentence. (Id.)

Petitioner admits that counsel conveyed the 15-year plea offer to him. Petitioner admits that he and counsel discussed the offer at some length. Petitioner states that counsel suggested he discuss the plea offer with his family and "sleep on it overnight." (Id.) Although Petitioner contends that counsel did not "review the statutory or guideline penalties" with him during this meeting, he indicates elsewhere in the Motion that by proceeding to trial, he knew he faced a sentence in the 12-year range, at best, and a life sentence, at worst. (Id.) The Court is not persuaded that counsel's statements during the plea discussions, as recited by the Petitioner, were inaccurate or unreasonable.

18

Notwithstanding Petitioner's understanding of his options, he contends that counsel should have advised him that it was a mistake to reject the plea offer. Encouraging the Petitioner to accept the offer, however, could be construed as exertion of undue pressure on the Petitioner's decision-making process. Petitioner admits that he knew the Government's proof was "substantial and damning" and that counsel told him that Hale's testimony would have a "devastating impact" on his defense, but the Petitioner rejected the plea offer anyway because "he could not plead guilty to something he did not do (meaning the murder of Kuntz) and that he would have to trust the defense." (Motion, at 8). As the Sixth Circuit has clearly held, counsel is not ineffective for leaving the ultimate decision of whether to go to trial to the person who will bear the ultimate consequence of a conviction.[2]

This Court concludes that the facts alleged in the Petitioner's Motion indicate that trial counsel effectively balanced his duty to provide adequate advice to the Petitioner, while avoiding coercing him into accepting the plea offer. Petitioner rejected the plea offer and took his chances that he could successfully convince a jury that he, as a poorly-trained prison guard and upstanding citizen, should not be held responsible for the death of inmate Kuntz. He has not shown that this choice was based on the inadequate advice of trial counsel.

Thus, the Court concludes that Petitioner's ineffective assistance claim is without merit and is dismissed.

## IV. Conclusion

For the reasons set forth herein, the Court concludes that Petitioner is not entitled to relief

---

[2] The Court is not persuaded that counsel was ineffective because a phrase he used for "consolation and encouragement" ("we've still got this") was interpreted by Petitioner as a sign he should reject the plea offer.

19

under 28 U.S.C. § 2255. Therefore, the Petitioner's Motion Under § 2255 is denied, and this action is dismissed.

Should the Petitioner give timely notice of an appeal from this Memorandum and Order, such notice shall be treated as a application for a certificate of appealability, 28 U.S.C. 2253(c), which will not issue because the Petitioner has failed to make a substantial showing of the denial of a constitutional right. <u>Castro v. United States</u>, 310 F.3d 900 (6th Cir. 2002).

It is so ORDERED.

*Todd Campbell*
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE